# SAPONE & PETRILLO, LLP

William S. Petrillo, Esq., Partner                                          Edward V. Sapone, Esq., Partner

<table>
<tr><td>MANHATTAN</td><td>LONG ISLAND</td></tr>
<tr><td>40 Fulton Street, 17th Floor</td><td>1103 Stewart Avenue, Suite 200</td></tr>
<tr><td>New York, New York 10038</td><td>Garden City, New York 11530</td></tr>
<tr><td>Telephone: (212) 349-9000</td><td>Telephone: (516) 678-2800</td></tr>
<tr><td>Facsimile: (212) 349-9003</td><td>Facsimile: (516) 977-1977</td></tr>
<tr><td>E-mail: ed@saponepetrillo.com</td><td>E-mail: bill@saponepetrillo.com</td></tr>
</table>

July 1, 2022

**BY ECF**
The Honorable Frederic Block
Senior United States District Judge
United States District Court for the
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

>          Re:  *United States v. Yang*
>               *Docket No: 20-CR-531 (FB)*

Dear Judge Block:

I am counsel to Defendant James Ying Hang Yang ("***James***" or "***Mr. Yang***").  I offer this sentencing letter on behalf of James in anticipation of his sentencing before Your Honor on July 6th at 3:00 p.m.

James is a 29-year-old young man who had just turned 26 in the fall of 2019 when, over the course of a few months, he fed non-public stock information to a high school buddy and helped him buy and sell those stocks. James had been working as an analyst for a financial analytics company that researches and publishes data about the stock market.  During his employment, James became aware of information not yet available to the public and then

supplied it to his friend and traded on his friend's account.  He and his friend used the information to buy approximately a dozen different stocks.  Although this is not a case in which there is any victim who lost money, it is of course illegal to share information not publicly available, and James knows that.

James is saddled with regret over what he did.  His sorrow is palpable.  For the almost two years since his arrest, he has beaten himself up over what he did and the disgrace he has brought upon himself.   When I met him in September 2020 when he was arrested, he immediately told me that he wanted to accept full responsibility, and so a few months later I scheduled a change of plea and he pled guilty in December 2020.

James' Guidelines are only 30-37 months.  And this is not a case in which Congress is forcing Your Honor to put this young man behind bars.  James is a first-time offender with zero criminal history points, he has lost many multiples of the money he gained from the crime, and he has lost so much more than money.

James is a humble, hard-working, loyal, and sweet young man whom I am eager to introduce to Your Honor meet at sentencing.  Although James' mother is very disappointed by what he did to disgrace himself and his family, he is the apple of her eye, and the one in the family who has always helped everyone else.  And since he committed this crime, he has returned to the completely law-abiding life he had always lived.  He has a new job, and he is back to helping his mother and father and extended family.  He will be on the hook for a large forfeiture amount.  The $912,000 forfeiture order far exceeds the roughly $105,000 that James got from the stock investments placed through his friend's account.

2

I am asking Your Honor to flex your power to punish James and send a message to other would-be criminals without putting him behind bars.  The crime lasted only for a few months, and James stopped it 11 months before he was arrested.  During that 11 months, he continued to work to help support his family.  Income tax was paid on all of the profit, and the government seized $470,000 from James' bank account.  Since his arrest and pretrial release almost two years ago, James has remained gainfully employed.  He has never left his residence with his parents, brother and sister-in-law, and he has continued to lend support to everyone in the family.  Although I underscore that what James did was wrong, and that there is no excuse for it, James does not belong in prison.  Here is the sentence I respectfully propose to Your Honor:

-Time-served;

-Three years of supervised release;

-Conditions of supervision, including that he complete 300 hours of community service helping poor and homeless people, and maintain full-time employment so that he can continue to help his family and contribute to the order of forfeiture;

-Six months of home confinement (if you believe that a further loss of his liberties is needed); and

-An order of forfeiture for the full amount of the money earned by James and his friend.

I believe this requested sentence is sufficient but not greater than necessary to meet the goals of sentencing laid out in 18 U.S.C. §3553(a).

James has endured significant struggles throughout his life.  He has worked and studied hard.  And he has been extremely loyal to his mother and father and extended family whom he has helped to support.  This case represents a fall from grace, as James—as young as he is—used to be the family's shining star, the one person in the family who everyone looked up to.  But when he was arrested by federal agents, his whole world came crashing down along with the

excellent reputation that he had built up over a lifetime.  Since then, and as will be discussed more in this submission, James has done everything he could do to pick up the pieces of his broken life.

By way of a more complete background, James' high school friend had a stock account and a bank account. Together they invested in stocks of which companies James had inside information obtained from his employment.  Through these investments, the pair made approximately $900,000.  From that money, it is my understanding (and always guided by the government's proof) that James received approximately only $105,000.  The young men made sure that the IRS received $400,000 of the $900,000 earned.  James' friend made approximately $400,000, of which he lost approximately $200,000 on certain investments, and he, therefore, profited by approximately $200,000.  Restitution is not an issue in this case.

A collateral consequence here is that James had accumulated $470,000, which represented his life's savings, earned from working, investing, and saving money. The government seized his entire $470,000, and it will be forfeited.   James was going to use $120,000 of this amount that was seized to pay income tax.  Since his arrest in September of 2020, he paid to the IRS $30,000 of the intended $120,000.  He is on a payment plan to pay the remaining $90,000.

From a financial perspective, crime certainly didn't pay.  James got $105,000 from the crime, yet he lost $470,000, and he will be on the hook for so much more.  This is not a case where anyone lost money, and the IRS got income tax money on all of the money earned and seized from James.

James has ruined his life, and he's trying to pick up the pieces.  Most hurtful is the loss of his reputation among his family and community.

Since he graduated from college, James has been the bread winner.  He has an older brother who is two years older than James, yet it has been James who has taken care of everyone.  Dad is 52 years old, yet James has been looked upon as a patriarch of sorts.  Living in the family home is his mom and dad, his brother and his brother's fiancée, and James.  James has always paid for the groceries, he has twice paid to fix the roof, he has paid the family's medical expenses, he purchased a washer and dryer to keep mom from going to the public laundromat during the pandemic, and he bought the family a car.  The family loves James, but he has disgraced and dishonored his family's name.

His mother has been crying on a daily basis since James was arrested.  Her blood pressure is through the roof.  Mom has been trying to make up for lost time.  Dad left when mom was pregnant.  He came to New York to work to feed the family.  Mom then came to New York as well and left James when he was seven years of age.  His grandparents raised him until he was 16 when he too came to New York.  James worked hard and excelled in high school as an A-student.  He worked hard and excelled at Stony Brook University as a double major.  He graduated with a 3.4 GPA.  He also always had a job: busboy, waiter, warehouse, and he sold electronics at Best Buy.

Mr. Yang accepted responsibility on December 17, 2020, pursuant to a plea agreement with the government, to a one-count Information (20-CR-531) charging him with Securities Fraud (15 U.S.C. §§78j(b) & 78ff). According to both the plea agreement and the Probation

Office, the Court should begin its sentencing analysis at an advisory sentencing range of 30 to 37 months of imprisonment.

Probation recommends a bottom-of-the-Guidelines sentence of 30 months' imprisonment. Respectfully, I submit that an incarceratory sentence would be greater than necessary to achieve the objectives of sentencing for several reasons, not least of which is because if Mr. Yang is sent to prison, he is not the only one who will suffer; Mr. Yang's parents and grandparents, who raised him until he was sixteen, will suffer as they depend on him for emotional support as well as financially, especially during the pandemic where their health issues and inconsistent employment have prevented them from working as much as they ordinarily would.

Mr. Yang recognizes the seriousness of his crime. He has no one to blame but himself; nor does he wish to blame anyone but himself. He continues to punish himself every day under the weight of the shame he has brought on himself and on his family. No information or analysis I offer the Court is intended to excuse his misconduct. Mr. Yang understands that there is no excuse. It is important, however, that the whole person be considered at sentencing, which includes Mr. Yang's exceptional history and characteristics, and the circumstances of this offense.

In this regard, it is important to note that:

(1)     *Mr. Yang's conduct was an aberration* – Mr. Yang's life has been characterized by hard work and dedication to his family. He grew up in poverty in Fuzhou (Fujian Province), China before emigrating to the United States at 16 years of age. He worked incredibly hard to overcome substantial language and cultural barriers to graduate high school near the top of his class, achieve dual degrees

in Mathematics and Economics in three-and-one-half years from Stony Brook University, and achieve his master's degree from Columbia University while working full-time, often exceeding 100 hours per week. Whatever he has earned from his hard work, he has used to support his family and his community, not himself. This is his first and only interaction with the criminal justice system, and there is little question that it will be his last;

(2)     *Mr. Yang does not need a prison sentence to be specifically deterred* – Attached to this memorandum are letters submitted for Mr. Yang that demonstrate that his actions are a complete departure from whatever could be imagined by those who best know him. He is 29 years of age, he was only 26 years of age at the time of the offense. He has never before been arrested. He has never been in any kind of trouble. He voluntarily stopped his illegal conduct before any investigation was undertaken by the SEC or the FBI, after coming to terms with the fact that what he was doing was wrong, and he has demonstrated consistent and substantial remorse for his actions. These facts, together with prominent social science research, indicate that Mr. Yang poses zero risk of recidivism;

(3)     *Mr. Yang faces substantial collateral consequences* – Mr. Yang had worked exceedingly hard throughout his young life to excel academically, and to achieve the opportunity to pursue employment that provided a pathway out of poverty for himself and his family. Because of Mr. Yang's short-lived decision to trade on material non-public information, he has permanently lost his dream

7

job and a profession he enjoyed.  With the scarlet letter of a felony conviction, as well as a substantial financial judgment hanging over his head for the rest of his life, he has drastically changed the fortunes of not just himself but his whole family. Mr. Yang has also had to live with the shame his actions have brought not just on him, but his family, a violation of the very important virtues of honor and respect which are so greatly adhered to in the Chinese culture;

(4)     *The whole person* – Mr. Yang, the second child born to his parents under China's one-child policy, has had to fight to justify his existence his whole life. His father left for the United States before he was born, and never saw him until he was sixteen years old, and his mother left seven years later, an additional parent who he did not see for another 10 years, leaving him and his brother to be raised by their grandparents until they were teenagers. Despite growing up under poor economic conditions, Mr. Yang worked hard and excelled in school. Mr. Yang also demonstrated from a young age a desire to help others; as early as five years old, Mr. Yang was noted for helping classmates with their schoolwork and for helping his grandparents with the farming, laundry and other household chores. Mr. Yang's kindness and compassion has only grown over the years, and has been displayed throughout his life by the way he has cared for his parents, helped college classmates with their studies before staying up late into the night to finish his own work, and giving his time and money in support of causes like the Red Cross and the

Wuhan Coronavirus Fund. He was also a blood donor for the New York Blood Center. He is a model of hard work, and compassion, whose whole life has been dedicated to improving the lives of others.

For these reasons, and in light of the factors of 18 U.S.C. §3553(a), I respectfully submit that the requested sentence satisfies the parsimony clause and serves the interests of justice.

*Mr. Yang's History & Characteristics*

Mr. Yang is 29 years of age. He was born in a small town in Fujian Province, China. He is the second child born to his parents at a time when the one child policy was being enforced in China. For that reason, he was born in a relative's home instead of a hospital, under very poor medical conditions that were risky both to him and his mother.

In China, Mr. Yang's family was very poor. Prior to his birth, when his mother was only a few months pregnant with him, Mr. Yang's father came to the United States to desperately pursue better economic opportunities and livelihood to support his family, as they were expecting a second child. And when Mr. Yang was just six years old, his mother followed suit. From the time that Mr. Yang was six until he was 16, he and his brother lived with their maternal grandparents.

Even as a young boy, Mr. Yang was known for being respectful and helpful to anyone he came across. He felt responsible for easing the burden placed on his grandparents for having to care for him and his brother. While other children were out playing, he focused on his education, and helped his grandparents, he never wanted to be a troublemaker, so he feels extremely shameful for his conduct. According to Yinen Cai, Mr. Yang's mother: "his kindergarten teachers told me how he helped other kids with math exercise and helped teachers organize homework papers even at such a young age." (Exhibit A).

9

According to Binhui Cai, Mr. Yang's cousin: "Yinghang was filial, self-reliant, and responsible. He is one of those children who is self-disciplined and humble. He would always come home before curfew time to help our grandparents with chores and laundry because he did not want to be a burden and wanted to be helpful as much as possible for our elder grandparents. He puts family first and is considerate of others." (Exhibit B).

Zhen Chen, another of Mr. Yang's cousins, shares a similar recollection: "I noticed early on that Yinghang Yang was an accommodating, respectful and bright child. […] I always saw him helping out my grandparent to do laundry and cultivate plants because he did not want to see our grandparents getting busy and tired. […] He was not only getting good grades, but he also helped neighbor students' and my youngest cousin's homeworks after his work was completed. He always puts family first place and is considerate of others." (Exhibit C).

In 2009, when he was 16, Mr. Yang and his brother came to the United States to join their parents. Mr. Yang's father was working as a cook in a restaurant and his mother worked in a factory. Neither Mr. Yang nor his brother spoke any English when they arrived in New York, and they struggled initially to fit in given the language and cultural barriers they faced. Mr. Yang recalls being bullied and laughed at because of his poor English. Instead of discouraging him, however, it only motivated Mr. Yang to work harder to improve his English, and prove the doubters wrong.

Mr. Yang put long hours into his studies, and despite coming to the United States as a 16-year-old, with no English proficiency, he finished high school in three years, while averaging 97 out of 100 in all of his courses. He participated in math competitions, the United Nations Association of the United States of America essay contest, was a member of the National Honor

10

Society of Secondary Schools, and participated in the No Place for Hate bullying prevention program at his high school.

According to his cousin, Zhen Chen: "He often volunteered to help students and parents who need to translate in high school. […] He studied hard and helped his friends all the time. […] [H]e always offered to tutor others before his own things and studied late at night. His success was not a surprise to anybody. His kindness and humbleness not only helped him to achieve academic success, but it also was very meaningful to the society around him as well." (Exhibit C).

In 2012, Mr. Yang graduated from Newcomers High School in Queens, and enrolled at Stony Brook University on Long Island, where he was a recipient of an Albert Shankar College Scholarship.   Mr. Yang remained dedicated to his studies, spending almost all of his time between classrooms and the library. In just three-and-a-half years, he completed dual degrees in mathematics and economics, which usually takes a total of five years to achieve. He also served as a certified tutor, working with other students who needed help outside the classroom. Meanwhile, on every break from school, including summers and breaks between semesters, Mr. Yang worked to help support his family financially, holding positions as a busboy, waiter, as a retail salesman and working in a warehouse. In December 2015, he graduated from Stony Brook with a Bachelor's of Science degree, and immediately went to work as a Derivatives Associate at BNY Mellon. He enrolled in a master's program at Columbia University, a few months into the job.

After a year at BNY Mellon, Mr. Yang left to work as an Analyst at JP Morgan from January 2017 to September 2018. Mr. Yang worked full time, while going to school full time,

often working in excess of 100 hours per week. After two years, in 2018, he graduated from Columbia with a Master's Degree in Enterprise Risk Management, having achieved a 3.3 cumulative GPA while juggling both school and work. (*See* Exhibit D - Diploma and Transcript).

Discussing Mr. Yang's tireless work ethic, childhood friend, Yong Teng Lin, described Mr. Yang as "one of the most hardworking people I have ever seen in my life." (Exhibit E).

Shortly after finishing his degree, Mr. Yang took a position at S&P Global as a Senior Index Analyst. He held that position for two years until he was fired following his arrest in the instant case.

Mr. Yang was proud to have achieved his degree and a position that paid him in excess of $100,000 annually. His parents received only a few years of education in China; neither finished elementary school because their families were poor, and both of Mr. Yang's parents have spent their entire lives working long hours for little pay at physically demanding, back-breaking jobs. His father suffers from pain in his legs because he has to stand for long periods of time working as a cook. His mother suffers from high blood pressure, which requires her to take medication daily. They have worked extremely hard, and have spent everything they've earned to support their family. Mr. Yang saw his education and his budding career as an opportunity to pursue the American dream, and to pull his family out of poverty, a family who spent too many years apart due to sacrifice and hard work and was only re-united in 2009.

According to his cousin: "As an immigrant, Yinghang overcame a substantial number of obstacles and challenges to reach his goals and be a great contributor to our family and community. His achievements were not an accident, but the product of his determination and commitment to succeed and change the life of his family for the better." (Exhibit B).

As soon as Mr. Yang began earning a more substantial salary, he did not spend it on himself, he used it to help his family and his community. According to his cousin: "he purchased a washing machine & dryer for his household because he knew how much time his mother had spent on laundromat and the high risk for his family to go to laundromat during the pandemic as his mother has a weakened immune system. He also covered a large portion of the cost for his home repairs & maintenance as soon as he could afford it. […] Yinghang has become the sole pillar of support to his family since his parents are very dependent on him financially and emotionally." (Exhibit B). In addition to helping his parents pay their bills and expenses, he continues to help his parents at home by doing chores, cooking meals, and helping to translate for them.

He is in all respects a respectful and dutiful son. His dream for success was never his dream, but his family's dream. This is evident in the many letters submitted for the Court's consideration.

According to Chunxian Yang, Mr. Yang's father:

> Yinghang has been kind and humble growing up and he has dedicated most of his time to help our family and extended family members. […]. He has been the primary support of our family financially in last few years after he finished his education. He provided family necessary financial needs, such as food, bills and living expenses when my wife and I have not had stable work and my wife has chronic hypertension that requires daily medicines and additional caring. He has been irreplaceable and the core of our family […].

(Exhibit F).

This is echoed by Mr. Yang's mother, who describes her son as:

always humble, respectful to others, and the leader of our family. […] He never stops having our family as top priority in his heart and only with him, we are a complete family. Yinghang is the core of our family, and our main financial support last few years. He covered large portion of our house repair. When our roof leaked and floor needed necessary repair, he got our family covered by contributing to the huge costs that were unaffordable to us. Having a warm house seems simple to many families but is hard for us to have and something he helped us built. He told us, 'mom you had worked so hard for us, now it is my turn to provide you a better living condition.'

(Exhibit A).

Jiemin Yang, Mr. Yang's cousin, similarly shares: "Yinghang is one of the most caring, lovable and respectful family members and citizens that I know of. He is always there to offer helps when the family needs. […] Politeness is highly valued in our Chinese family, and he sets up a great example by showing gratitude and respect to all the elders in the family." (Exhibit G).

Yong Teng Lin, a friend of Mr. Yang's since childhood, describes how Mr. Yang possesses "the virtue of filial piety, which is highly valued in our Chinese culture. He has been showing utmost respect and support for his parents and elders. For instance, he provides consistent financial supports to his parents when they do not have stable jobs and need support." (Exhibit E).

And according to Keren Liu, a family friend: "Yinghang Yang is respectful of his parents and spares no efforts in contributing to his family. Whenever my husband and I go to his house, I almost always see him helping his mother out with household chores. He also helps his younger cousins with their homework in his free time." (Exhibit H).

Mr. Yang's kindness and compassion is not reserved just for his family. He is known throughout his community as someone who is there to help anyone in need. According to Chris Pan:

> Yinghang has always been an upright character in the community. In our friendship, he has really been there for me, especially when the company I worked for closed. He made it a point to be there and show a significant amount of support during a sudden and arduous job search. […] He has truly been a good friend over the years. In addition to our friendship, he is an upstanding member in the neighborhood. I still remember[] every time he helped elder neighbors lifting heavy package to the house and moved out the recycling bins. During the Pandemic, he has been helping elder neighbors whenever he is able to.

(Exhibit I).

This is echoed by Ren Dong, who studied with Mr. Yang at Stony Brook. Mr. Dong describes Mr. Yang as: "modest, considerate, [and] dedicated to the well-being of others. […] Yinghang Yang always tried to influence his friends and family in a positive way. For instance, when I had academic challenges and doubt about my college study, he helped me through my struggle and provided advice so that I'd be able to refocus on my education and build towards my goals." (Exhibit J).

Hengliang Lin, a friend of Mr. Yang's from high school, similarly describes Mr. Yang as a "very humble and hard-working person," and as "a good mentor for me." He describes how Mr. Yang helped him when they were both members of the math team, and how after graduating from college, Mr. Yang helped him to find the right job. According to Mr. Lin: "I am grateful to [Mr. Yang] and feel fortunate that we became close friends over the years. I can confirm that in

15

all the time I have known him, Yinghang Yang has been a trustworthy and upright person."

(Exhibit K).

Junde Lin, another longtime friend of Mr. Yang's tells a similar story:

> Yinghang Yang has always been kind in our friendship. He is always there for me, especially when I have troubles. I still remember when we had a college probability class together, I was struggling to understand some of the concepts in class. It was Yinghang who took the initiative and helped me understand these complex concepts. Without his help, I don't think I would be able to do well in the course. In addition to our friendship, he is also an upstanding member in the community. He is the type of person who always gives back to the community. For example, I know he has donated several times to charity funds for helping natural disasters and humanitarian relief effort even though he still has large obligations to his family. He has also attended several career events voluntarily to help fellow students on how to plan their career and listen to people with hurdles they encounter. His kindness and generosity have helped and influenced many around him and benefited our community. I am one of those who truly appreciate his help and I trust Yinghang to be an honorable friend, a valuable man for the community and a good human being.

(Exhibit L).

Mr. Yang's desire to help others near and far is also emphasized by Kayi Chan, Mr. Yang's significant other:

> Yinghang is a caring, kind, and decent person.  […] Yinghang has a kind heart. […] He told me that when times are right, he would want to travel to poor rural areas of China or Africa, to teach kids especially those whose parents left home and had to go to bigger places for work. He said he sees himself in them when he read stories about this group of left-behind kids and share same pain with them, so he wanted to help. From these types of actions, I know he is someone you can trust to be a productive member and good contributor to the society.

(Exhibit M).

Xiaofei Mei, another longtime friend of Mr. Yang's, posits: "I genuinely believe our community needs Yinghang's contribution. Yinghang is always willing to help others. […] He has been a role model and an inspirational figure for people around him in many ways." (Exhibit N). And according to Shuwei Gao, a friend of Mr. Yang's since high school, Mr. Yang has "always been an upright character […]. Yinghang is always a smart person and volunteered to help others with his knowledge in all aspects. […] [I]n our friendship, he has really been there for me, he is always a caring friend and is truly a model of generosity of spirit." (Exhibit O).

As evidenced by the attached letters, there remains a community of people who know Mr. Yang to be a good man, who works hard, is kind and compassionate, and whose life has been devoted to bettering those of the people around him. They all ask that the Court give Mr. Yang a chance to correct his mistake and to continue to serve his family and community.

*The Nature and Circumstances of the Offense*

The nature of the offense is serious. Mr. Yang used material non-public information he learned at his job to profit off of a series of securities transactions using a friend's trading account. Mr. Yang has accepted full responsibility for his misconduct. He has not sought to shirk responsibility, or to blame anyone but himself. Mr. Yang acknowledges the gravity of his offense, and he deeply regrets the mistakes he made. He asks only for an opportunity to make amends and to continue to contribute positively to his community.

Notably, immediately following his arrest, in September 2020, Mr. Yang waived his Miranda rights and spoke candidly with the case agent. During that conversation, he made clear that he did not set out to break the law. When he made his first trade, be believed the information he was using was public. Nonetheless, a time came when he learned that he was trading on

17

insider information and continued to trade. For that, he immediately accepted responsibility. In October 2019, Mr. Yang was riddled with guilt and worried about the ramifications of his and his friend's misconduct.  Remarkably, they placed some trades that they believed would result in losses which is exactly what occurred.  Mr. Yang and his friend had caused no unlawful trades to occur for 11 months and then, in September 2020, Mr. Yang was arrested and charged with the instant offense.  He also gave away to friends, family and charities a significant portion of the approximate $100,000 he earned from the crime.  According to Mr. Yang, he felt better giving the money away because there "were a lot of nights where I couldn't even fall asleep for what I did, it's – it's just huge remorse." Notably, this was before any investigation into Mr. Yang was initiated by either the SEC or FBI.  So not only did he stop committing the crime for almost a year before he was arrested or even before an investigation even ensued, his conscience guided him to give away a large portion of what he earned.

Further, while in no way seeking to minimize Mr. Yang's misconduct, we believe it is important to note two things. *First*, while the purpose of trading on the insider information was profit, Mr. Yang's intention was never to enrich himself.  Mr. Yang did not purchase any luxury items such as a car, designer clothing, or jewelry; quite frankly he rarely spent any money on himself.  Instead he paid to repair the leaking roof and floor of the home he shares with his parents, he bought a washer and dryer so that his mother would not have to risk her health by going to the public laundromat, and he donated money to worthy causes. Between July and November of 2019 and February 2020, Mr. Yang donated more than $1,000 to the American Red Cross, who recognized him as a Clara Barton Society member. (*See* Exhibit P). In February 2020, Mr. Yang also donated to the Wuhan Coronavirus Fund, before anyone knew what the

18

coronavirus pandemic would become. (*See* Exhibit P).  *Second*, while the offense involved a large total sum of money, only a small percentage of that money went to Mr. Yang. Mr. Yang is legally responsible for the total profits generated by the trades made in his friend Chen's brokerage account ($912,082), but between the portion of the profits retained by Mr. Chen, and those lost back into the market, Mr. Yang received only $125,000 in checks, cash and funds transfers, representing only 13.7 % of the total profits. Mr. Yang, has, nonetheless, agreed to the entry of a forfeiture money judgment against him in the full amount of $912,082, and the forfeiture of bank and brokerage accounts totaling in excess of $500,000, more than 400% what he actually received from his participation in the instant offense.

While correctly calculated under the law, Mr. Yang's Guidelines range and the agreed upon forfeiture total reflect a significantly greater loss amount than any gain that was actually realized by Mr. Yang. Respectfully, when considered together with Mr. Yang's voluntary cessation of his illegal conduct, immediate acceptance of responsibility and the laudable uses which were made of the illegally obtained profits, I believe that this weighs in favor of the requested downward variance.

None of this is meant to excuse what Mr. Yang did or to diminish the damage done by insider trading. There is no excuse. I believe it is important, however, to understand the context in which Mr. Yang committed the instant offense as the Court contemplates the appropriate sentence. And here, I believe that context is compelling and mitigating.

*The Need for the Sentence Imposed to Reflect the  Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, and to Avoid Unwarranted Sentence Disparities (§ 3553(a)(2)&(6))*

As the Court reflects upon the person being sentenced, I urge Your Honor to consider that the requested sentence will reflect the seriousness of the offense, promote respect for the law and provide just punishment. Mr. Yang deeply regrets what he did. His mistakes, however, do not fully define the person being sentenced. The attached letters from his family and community demonstrate that Mr. Yang is a hard-working, kind and caring person, who has devoted his life to lifting up the lives of those around him.  Someone who has worked tirelessly and has sacrificed for the benefit of his family, friends and those most in need of charity.

For its part, the United States Sentencing Commission (the "*USSC*") has noted that "dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders." *Alternative Sentencing in the Federal Criminal Justice System*, United States Sentencing Commission, January 2009, pg. 1. Mr. Yang is just such a first-time, nonviolent offender. He has lived almost his entire young life as a positive and productive member of society. He does not need to be imprisoned to be punished. The requested sentence will mean that Mr. Yang, at the end of the day, will have spent more than three years reporting to either a pretrial services or probation officer, being subjected to strict supervision. *See United States v. Gall*, 552 U.S. 38, 48-9 (2007) (describing probation as a punishment that "severely restricts an individual's liberty"); quoting *United States v. Knights*, 534 U.S. 112, 119 (2001) (explaining that "[probationers are] subject to several standard conditions that substantially restrict their liberty"); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (underscoring that "[probationers] do not enjoy the absolute liberty to which every citizen is entitled"). He will also be subject to a sizable forfeiture order, which in this case obligates him to pay to the government a sum that is many

times what he benefited from the offense. He will no doubt feel the effects of that order for many years to come.

Further, in addition to the obvious consequences Mr. Yang will suffer as a result of any sentence the Court imposes, he has faced, and will continue to face numerous collateral consequences. He has lost his job at S & P Global, and his career in the financial services world. He has lost all of his savings and most of the income he used to support his family. His name has been widely publicized in the media, and his reputation, earned through years of hard work and dedicated study, is permanently tarnished. And most devastating, he and his family have incurred deep shame in the Chinese community as a result of Mr. Yang's actions. Lastly, as a first time felony offender, Mr. Yang will continue to face myriad collateral consequences well into the future.

According to Professor Michelle Alexander, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'" Michelle Alexander, The New Jim Crow 142 (2010). As such, Mr. Yang will no doubt face many additional obstacles as he seeks to reestablish himself in the community following this case. He does not need to be imprisoned to understand that his actions have consequences.

Finally, the requested sentence would not result in a sentencing disparity. An evaluation of the Sentencing Commission's sourcebook[1] is revealing in this regard. Of the 2,416 defendants sentenced in the Second Circuit in 2021, only 655 (27.1%) received a within-the-guidelines

---

[1] *See* United States Sentencing Commission Sourcebook of Federal Sentencing Statistics for Fiscal Year 2019.

sentence, while 1,281 (53.0%) received a variant sentence. (*See* Exhibit Q). Of the 498 defendants sentenced in the Eastern District of New York, only 24.7% received a within-the-guidelines sentence, while 49.0% received sentences below the guidelines minimum sentence based solely on *United States v. Booker,* 543 U.S. 220 (2005), and the factors of 18 U.S.C. §3553(a). (*See* Exhibit Q).

Therefore, while every case presents different facts and circumstances, given Mr. Yang's unique history and characteristics, his remorse and acceptance of responsibility, and the likely collateral consequences of his conviction, the requested sentence will provide just punishment for the offense and promote respect for the law.

*A Sentence of Three Years of Supervised Release and Six Months of Home Confinement Can Provide Adequate General Deterrence, and Protect the Public from Future Offenses by Mr. Yang*

The requested sentence can provide adequate general and specific deterrence. The available empirical evidence does not support a finding that a prison sentence necessarily leads to increased deterrent effects, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006)("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

While we appreciate the need for general deterrence, it appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies. *See* Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011); Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 8 (2010), available at http://www.sentencingproject. org/doc/ Deterrence% 20Briefing% 20.pdf.

Nonetheless, the requested sentence sends a powerful message to the community that insider trading will not be tolerated. Mr. Yang has already spent approximately 22 months on pretrial supervision and will spend years more reporting to a probation officer. He faces myriad collateral consequences as a result of sustaining a felony conviction, including the loss of his career and a forfeiture order approaching $1 million. No one looking at Mr. Yang's case would think that engaging in the criminal acts that he engaged in will pay any dividends.

Studies have also demonstrated that, except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their

counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has similarly found that "[t]here is no correlation between recidivism and guidelines' offense level. … While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

A more relevant predictor of recidivism is a defendant's criminal history, of which Mr. Yang has none. Social science research indicates low recidivism rates for offenders with no prior criminal history. In 2004, the USSC issued a report as part of its research series on the recidivism of federal guidelines offenders entitled: *Recidivism and the 'First Offender": A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, May 2004. In its report, the U.S.S.C. notes:

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment.

*Id*., p. 1; *see also* 28 U.S.C. § 994(j).

The USSC found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points). *See id*., p. 13- 14, 26.

More specifically, among the category of offenders with zero criminal history points, those offenders who have never been arrested have the lowest recidivism rate at only 6.8% (compared with a recidivism rate of 17.2% for offenders with a history of arrest but no conviction, and 8.8% for offenders with a history of arrest and conviction for only "never-count" offenses specified under U.S.S.G. §4A1.2(c)(2)). *See id.*, p. 14, 26. The U.S.S.C. notes: "Its low recidivism rate makes first offender group A stand out. Recall that group A offenders have no prior criminal events, not even a prior arrest." *Id.*, p. 14.

Prior to this case, Mr. Yang had never before been arrested. He has lived a thoroughly law-abiding life. He thus falls within the category of defendants with the lowest rate of recidivism. And there are a number of reasons to believe that Mr. Yang will live up to those statistics. He has a history of consistent employment including school breaks and while pursuing his master's degree, dating back to his arrival in the United States in 2009. And while he suffered a brief period of unemployment following his arrest in this case, he has already begun to reinvent himself; he has been working over forty hours per week as a Product Research Lead for Nimex Group, an online retailer, developing and researching new merchandise, since December 2020. product research lead.

According to Mr. Yang's mother: "After months of difficult job searching during pandemic, he eventually found a work to rebuild with enormous difficulty. It is grateful to see him trying to make progress towards life. He works hard in his current job and we really hope that he can continue good progress so that our family can be put back on track to live a stable and simple life." (Exhibit A).

Qian Chen shares a similar observation:

His life has changed drastically and no longer the way he was trying so hard to build. He is regretted and remorseful for what he has done and vows never to repeat them. However, even amid tough times, he did not give up on himself. He started planning for his future and actively looking for a new job. About two months ago, he got himself a new job and has been working very hard at his current job. I assure that he will make great contributions to our society again, and I believe that his strength and moral character will prove him as an outstanding contributor to our society.

(Exhibit R).

Mr. Yang hopes to continue working in his current position as he attempts to reshape his future while continuing to support his family financially. Meanwhile, for the past 18 months, Mr. Yang has remained fully compliant with the terms of his release and he has taken advantage of this opportunity to engage in much needed reflection and self-rehabilitation.

According to Mr. Yang's cousin, Elyn Yang: "After extensively talking to Yinghang Yang, I assure you that he is very remorseful for his actions. He sincerely regrets his actions and vows to never repeat them." (Exhibit S).

Mr. Yang's father shares that Mr. Yang "has been very shameful for this and even more remorseful with this impacting our family tremendously and even worse during COVID 19 pandemic." (Exhibit F).

Junde Lin, a friend of Mr. Yang's for more than 10 years, has observed Mr. Yang's "deep sense of remorse," and implores the Court to consider leniency. According to Mr. Lin, "I strongly believe that he will emerge as a better person going forwards and continue being an important contributor in our community." (Exhibit L).

According to Kayi Chan, Mr. Yang's significant other, Mr. Yang is "extremely remorseful and blame[s] himself for all the pains have caused on his family, friends and everyone who had

high hope on him." Nonetheless, according to Ms. Chan, Mr. Yang "remains committed to family and loved ones, and is working full time after a difficult job search." (Exhibit M).

Binhui Cai and Shuwei Gao have also both observed Mr. Yang's deep sense of remorse and acceptance of responsibility as he has reflected on his poor choices. (*See* Exhibits B & O).

Finally, according to Mr. Yang's longtime friend, Thomas Lu: "James is a good person. I truly believe that his regrettable actions represent an aberration that he will never repeat. I can say beyond a shadow of a doubt, that he is an honest man." (Exhibit T).

As demonstrated by these letters of support[2], and his actions over the past 18 months, Mr. Yang has already begun to take the steps necessary to implement important changes in his life, and a prison sentence would only set back the important steps he has already taken. Respectfully, the public does not need protection from Mr. Yang. His remorse, rehabilitation, and anticipated probation supervision, all make him unlikely to reoffend. And, as demonstrated by the letters of support, Mr. Yang has a supportive family and community of friends who are willing to do everything in their power to assist him.

For all of the above reasons, I respectfully suggest that a sentence of time-served; three years of supervised release; 300 hours of community service; six months of home confinement (if you believe that a further loss of his liberties is needed); a condition of supervision that James continue to maintain full-time employment so that he can continue to help his mother and father and family and pay the order of forfeiture; and an order of forfeiture for the full amount of the money earned by James and his friend is sufficient but not greater than necessary to achieve the objectives of sentencing.

---

[2] Additional letters not quoted herein are attached as Exhibit U.

On behalf of Mr. Yang and his family, we thank Your Honor for considering this memorandum.  We look forward to addressing the Court on July 6, 2022.


Dated:        New York, New York
              July 1, 2022


                                    Respectfully submitted,


                                    /s/*Edward V. Sapone*
                                    Edward V. Sapone
                                    Sapone & Petrillo, LLP


cc:      AUSA Alixandra Eleis Smith